UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ENTREPRENEUR MEDIA, INC. a California corporation,

Plaintiff,

v.

KIRTON COMMUNICATIONS GROUP LIMITED, a Trinidad and Tobago corporation; MAS FINANCIAL & CORPORATE SERVICES LTD, a Trinidad and Tobago corporation; and DOES 1-10,

Defendants.

CASE NO. 3:15-cv-01415-SI

**[PROPOSED] ORDER REGARDING PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT AGAINST KIRTON COMMUNICATIONS GROUP LIMITED AND MAS FINANCIAL & CORPORATE SERVICES LTD**

Assigned to Hon. Susan Illston

Date: September 18, 2015
Time: 9:00 a.m.
Location: Courtroom 10, 19th Floor

Upon consideration of Plaintiff Entrepreneur Media's ("EMI") Application for Entry of Default Judgment against Kirton Communications Group Limited and MAS Financial & Corporate Services Ltd ("Application") and all supporting documents and pleadings of record, and good cause appearing therein, the Court hereby **ORDERS** that the Application is **GRANTED**, and finds as follows:

## I.  DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(b)(2) provides that a court may enter default judgment and, if necessary to effectuate judgment, conduct an accounting, determine the amount of damages, establish the truth of any allegation by evidence, or investigate any other matter. While the decision to grant or deny an application for default judgment is within the Court's discretion, "[i]n applying th[e] discretionary standard, default judgments are more often granted than denied." *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).  Courts are guided by the following factors when determining whether to grant default judgment: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim and the sufficiency of the complaint, (3) the sum of money at stake in the action, (4) the possibility of a dispute concerning material facts and whether the default was due to excusable neglect, and (5) the likelihood of obtaining a decision on the merits, which is favored. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  A plaintiff establishes trademark infringement or unfair competition by demonstrating that it has a protectable interest in the infringed mark, and the defendant's use of the mark is "likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011).

Here, the enumerated factors weigh heavily in favor of granting default judgment and awarding the requested relief.  EMI has complied with the procedural requirements for default judgment, including securing the entry of default against defendants Kirton Communications Group Limited and MAS Financial & Corporate Services Ltd (collectively, "Defendants").  As discussed below, Defendants have infringed EMI's strong and distinctive marks and show no signs of abating.  Because all allegations, except for those pertaining to damages, are taken as true once the Court Clerk enters default, there is no possibility of a dispute concerning the

material facts. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008). Further, there is no evidence of excusable neglect in the record, in particular since EMI made Defendants aware of the action by properly serving court documents on Defendants. Finally, while cases should be decided on the merits whenever possible, Defendants' failure to defend this action has made a decision on the merits impractical, if not impossible. *Elektra Entm't Grp. Inc. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2005).

## II. EMI'S TRADEMARK RIGHTS

EMI owns the following valid U.S. trademark registrations (collectively, "EMI Marks"):

| TRADEMARK | CLASS: GOODS/SERVICES | REG. NO.<br>REG. DATE |
|---|---|---|
| ENTREPRENEUR | 16: Paper goods and printed matter; namely magazines, books and published reports pertaining to business opportunities<br>First Use in Commerce: May 2, 1978 | 1,453,968<br>Aug. 25, 1987 |
| ENTREPRENEUR | 35: Advertising and business services, namely, arranging for the promotion of the goods and services of others by means of a global computer network and other computer online services providers; providing business information for the use of customers in the field of starting and operating small businesses and permitting customers to obtain information via a global computer network and other computer online service providers and; web advertising services, namely, providing active links to the websites of others<br>First Use in Commerce: July 1992 | 2,263,883<br>July 27, 1999 |
| ENTREPRENEUR | 35: Arranging and conducting trade show exhibitions in the field of entrepreneurial activities, namely the start-up and operation of small business enterprises<br>41: Educational services, namely, conducting seminars on the development and operation of businesses, and conducting workshops on computer technology, telecommunications, marketing, financing options, real estate management, tax planning and insurance<br>First Use in Commerce: October 18, 1991 | 2,502,032<br>Oct. 30, 2001 |
| ENTREPRENEUR | 38: Streaming of video and digital material on the Internet<br>First Use in Commerce: August 2007 | 4,260,948<br>Dec. 18, 2012 |
| ENTREPRENEUR | 9: downloadable computer software and software for mobile devices for the reproduction, display and distribution of digitized content.<br>First Use in Commerce: June 2008 | 4,345,424<br>June 4, 2013 |

| | | |
|---|---|---|
| ENTREPRENEUR.COM | 9: Downloadable podcasts in the field of business, current events, lifestyle issues, and developments in science and technology<br><br>35: Providing business information and advice via a web site on a global computer network<br><br>38: Broadcasting programs via a global computer network; and streamlining of audio and video material via the Internet; telecommunications services, namely, transmission of podcasts<br><br>First Use in Commerce: September 2002 | 3,519,022<br><br>Oct. 21, 2008 |
| ENTREPRENEUR PRESS | 16: Paper goods and printed matter, namely, books, manuals, prepared reports, work books, study guides, legal and business forms, and newsletters concerning advice and information relating to the subjects of starting, running and operating a business, and individuals who succeeded in business, which subjects are of interest to entrepreneurs, new and existing businesses and members of the general public<br><br>35: On-line ordering services featuring printed and electronically downloadable publications, namely, books, study guides, legal and business forms, and newsletters, concerning advice and information relating to the subjects of starting, running and operating a business and individuals who succeeded in business, which subjects are of interest to entrepreneurs, new and existing businesses and members of the general public<br><br>First Use in Commerce: April 1999 | 3,470,064<br><br>July 22, 2008 |
| ENTREPRENEUR'S STARTUPS | 16: Paper goods and printed matter; namely, magazines, books, booklets and published reports pertaining to business opportunities<br><br>First Use in Commerce: January 27, 2006 | 3,204,899<br><br>Feb. 6, 2007 |

Additionally, EMI's registration numbers 1,453,968; 2,263,883; and 2,502,032 for ENTREPRENEUR® and 3,204,899 for ENTREPRENEUR'S STARTUPS® are incontestable.

The federal registrations for the EMI Marks constitute prima facie evidence that the marks are valid and owned by EMI. 15 U.S.C. § 1115(a). Moreover, the incontestable registrations for the EMI Marks noted above constitute "conclusive evidence" of the validity of those registered marks, EMI's ownership of those marks, and EMI's "exclusive right to use the mark[s] in commerce." 15 U.S.C. § 1115(b).

Further, other courts have already recognized the validity and strength of the EMI Marks, including the ENTREPRENEUR® Mark, and the Court concurs with those decisions. The U.S. District Court for the Central District of California held that: (1) "[t]he extensive advertising and

public recognition over the past 25 years have established [the ENTREPRENEUR® mark] as a strong mark in the industry;" (2) the ENTREPRENEUR® mark "is a strong distinctive mark, deserving of significant protection;" and (3) the ENTREPRENEUR® mark "has acquired secondary meaning." *Entrepreneur Media, Inc. v. Smith*, No. 98-3607, 2004 U.S. Dist. Lexis 24078, at *9-10, 13 (C.D. Cal. June 23, 2004). The Ninth Circuit reviewed the District Court's findings and affirmed them on appeal. *Entrepreneur Media, Inc. v. Smith*, 101 Fed. Appx. 212 (9th Cir. 2004). Both a Magistrate Judge and District Court judge in the Eastern District of Virginia found the ENTREPRENEUR® mark to be distinctive, and the U.S. District Court for the District of Maryland recognized the EMI Marks as valid, strong, and distinctive. *Entrepreneur Media, Inc. v. seattleentrepreneur.com*, No. 11-00409, 2011 U.S. Dist. Lexis 139817, at *3-5 (E.D. Va. Dec. 6, 2011); *Entrepreneur Media, Inc. v. JMD Entertainment Group, LLC, et al*, 958 F. Supp. 2d 588, 594-596 (D. Md. 2013).

EMI has also developed extensive common law rights in the EMI Marks through consistent, wide-spread use of the marks throughout the United States. EMI and its predecessor companies have used the ENTREPRENEUR® mark for over thirty years to publish magazines and books that provide editorial content and other information, as well as offer products and services related or of interest to businesses, business owners, and prospective business owners. EMI's *ENTREPRENEUR®* magazine has a current paid circulation, including both subscriptions and newsstand sales, of more than 650,000 in the United States, is sold and distributed in over 100 foreign countries, and regularly features articles with high-profile entrepreneurs. EMI has also published over 200 books (and multiple e-books) under the ENTREPRENEUR® and ENTREPRENEUR PRESS® marks and it has conducted numerous seminars, workshops, and other educational events, many of which are sponsored by large, well known corporations such as American Express, State Farm Insurance, and Verizon.

EMI also owns and operates several websites, such as *entrepreneur.com*, to promote its goods and services. The *entrepreneur.com* website has averaged over 20 million unique visitors and over 85 million page views per month, and is ranked, respectively, as the 542 and 668 most visited website in the United States and world by Alexa. EMI's fame and high-quality content

and services have resulted in numerous co-branding business relationships with various companies, such as the UPS Store, MSNBC, and the Princeton Review.

As a result of the above activities and success, the EMI Marks, and in particular the ENTREPRENEUR® mark, have acquired extensive goodwill, developed a high degree of distinctiveness and secondary meaning, and become well known, famous, and recognized as identifying goods and services that originate from EMI, such that they are deserving of strong protection.

## III. DEFENDANTS' INFRINGEMENT OF EMI'S TRADEMARK RIGHTS

Defendants use the ENTREPRENEUR SPIRIT mark in commerce to offer business, educational, and advertising services targeted at small and medium-sized business owners. More specifically, Defendants use the ENTREPRENEUR SPIRIT mark to (1) publish a digital magazine providing in-depth interviews and business inspiration, tips and advice; (2) distribute online articles and other materials on the topics of entrepreneurship, startups, growing a business, finance, and business advice; and (3) offer advertising and promotional services to various businesses.

Defendants market their goods and services through various channels, such as a website (*entrepreneurspirit.org*, registered through the U.S.-based registrar GoDaddy.com, LLC), a mobile application (hosted and distributed via the iTunes store owned by the California-based Apple, Inc.), a Facebook page (*https://www.facebook.com/ESCMag*), a Twitter account (*https://twitter.com/ESC_Magazine*), and various other media outlets, such as a YouTube channel (*http://www.youtube.com/watch?v=z2c60UeKjyc*).

Defendants emphasize the ENTREPRENEUR portion of their mark, as shown here:

 

Further, both EMI and Defendants offer their goods through the iTunes store and target the same type of consumer, resulting in the Parties' apps appearing directly next to each other on a user's phone, as shown below:

Accordingly, Defendants have used the ENTREPRENEUR SPIRIT mark to sell, offer for sale, distribute, and advertise their goods and services.

Defendants' ENTREPRENEUR SPIRIT mark is likely to cause consumer confusion with the EMI Marks based on an examination of the relevant *Sleekcraft* factors, which are (1) the strength of EMI's marks; (2) the similarity of the marks; (3) the proximity of the parties' goods; (4) the identical marketing channels used; and (5) defendant's intent in selecting the mark. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979); *see also Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1145 (9th Cir. 2011) (the *Sleekcraft* factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist."); *Truong Giang Corp. v. Twinstar Tea Corp.*, No. 06-3594, 2007 U.S. Dist. Lexis 100237, at *26 (N.D. Cal. Mar. 22, 2007) (granting default judgment where all but the last three Sleekcraft factors weigh in favor of a likelihood of confusion.); *Discovery Commc'ns, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282 (C.D. Cal. 2001).

First, the EMI Marks, as discussed above, are strong and distinctive marks, especially the famous ENTREPRENEUR® mark. Second, the ENTREPRENEUR® and ENTREPRENEUR SPIRIT marks are essentially identical as the descriptive and non-source identifying "spirit" term does not distinguish the marks, which otherwise both share the leading and dominant "ENTREPRENEUR" term. *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876 (9th Cir. 2014); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992). Indeed, the marks, as used in the market, are largely indistinguishable as shown above, especially as Defendants place undue emphasis on the ENTREPRENEUR portion of their mark. Third, EMI and Defendants offer identical goods, namely magazines, and closely related goods and services under these essentially identical marks to the same class of consumers (small and medium-sized business owners). Fourth, EMI and Defendants offer these goods through the same or similar marketing channels, such as the iTunes store. As shown by the above picture that Defendants posted to their Facebook page, this greatly increases the potential for confusion as both parties' applications may appear directly next to each other on a user's phone. Fifth, as alleged in the Complaint (which is accepted as true), Defendants have intentionally, knowingly, deliberately, and willfully used their ENTREPRENEUR SPIRIT mark to violate EMI's trademark rights and trade off EMI's goodwill and reputation and have refused to cease this infringement.

Accordingly, the Court hereby **FINDS** that: (1) Defendants have infringed EMI's federally registered trademarks in violation of 15. U.S.C. § 1114; (2) Defendants have created a false designation of origin and false representation of association in violation of 15 U.S.C. § 1125(a); (3) Defendants have infringed EMI's trademarks in violation of California common law; and (4) Defendants have engaged in common law unfair competition.

## IV. JURISDICTION

Courts apply a three-prong test when analyzing specific jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of

its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).

Defendants have purposefully directed their activities at California and availed themselves of the privileges of conducting business in California. In particular, Defendants offer, market, and promote their goods and services under the ENTREPRENEUR SPIRIT mark through (a) the iTunes store, owned by the California-based Apple, Inc.; (b) a Facebook page (*facebook.com/ESCMag*), which is provided by the California-based Facebook, Inc.; (c) a Twitter page (*twitter.com/ESC_Magazine*), which is provided by the California-based Twitter, Inc.; and (d) an interactive website that allowed users to download the infringing ENTREPRENEUR SPIRIT magazine and subscribe to the ENTREPRENEUR SPIRIT newsletter, and was used to solicit advertisers for the *entrepreneurspirit.org* website. Therefore, Defendants have purposefully interacted with various California businesses and consumers and availed themselves of the privileges of conducting business in California. *See Facebook, Inc. v. Banana Ads LLC*, No. 11-03619, 2013 U.S. Dist. Lexis 65834, at *4 (N.D. Cal. Apr. 30, 2013); *see also Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).

EMI's causes of action directly arise from Defendants' activities in the State of California, namely the offering, marketing, and promoting of goods and services under the unauthorized and confusingly similar ENTREPRENEUR SPIRIT mark through California-based services to, *inter alia*, California residents, all of which directly harmed EMI, a California-based company. Indeed, Defendants were aware of EMI, the *ENTREPRENEUR*® magazine, and EMI's *entrepreneur.com* website, but refused to cease their infringing and harmful activity. *See Exobox Techs. Corp. v. Tsambis*, No. 14-00501, 2015 U.S. Dist. Lexis 2157, at *10 (D. Nev. Jan. 6, 2015); *craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1053 (N.D. Cal. 2010).

Based on this initial showing, "the burden shifts to the defendant to 'set forth a "compelling case" that the exercise of jurisdiction would not be reasonable.'" *See Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015). Defendants have not overcome this burden or

presented any arguments or evidence as to why this Court should not exercise its jurisdiction. Rather, the exercise of jurisdiction is reasonable here as Defendants could likely foresee litigation in California given their substantial interactions with the State and businesses and consumers within the State and knowledge of EMI, the EMI Marks, and the resulting harm to EMI from its activities. *CollegeSource, Inc. v. AcademyOne, Inc*., 653 F.3d 1066 (9th Cir. 2011).

Accordingly, the Court hereby **FINDS** that it has specific jurisdiction over Defendants and may properly enter a default judgment against them.

## V. INJUNCTIVE RELIEF

In consideration of the above and after weighing all appropriate equitable factors applicable to this case, the Court finds that permanent injunctive relief is appropriate because EMI has suffered irreparable injury that cannot be adequately compensated by monetary damages. *craigslist v. RealWorks*, No. 08-5072, 2009 U.S. Dist. Lexis 132432, at *8-9 (N.D. Cal. Oct. 29, 2009). Indeed, Defendants' lack of response to this lawsuit signals a threat of continued infringement that must be ceased. *Philip Morris U.S.A., Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 502 (C.D. Cal. 2003). As Defendants are operating their business in direct violation of the Lanham Act, the balance of hardships strongly tilts in EMI's favor, and the public's interest in preventing consumer confusion would be best served by a permanent injunction against such unlawful behavior.

Therefore, the Court hereby enters the following **PERMANENT INJUNCTION**:

A. Defendants, and their principals, officers, directors, members, partners, agents, servants, employees, and attorneys, and all other persons acting in concert or participating with them, who receive actual notice of the injunction order by personal or other service, shall permanently:

1. cease all use and never use the ENTREPRENEUR SPIRIT mark, the EMI marks, or any other mark likely to cause confusion with the EMI marks, in connection with the promotion, advertising, offering for sale, or sale, of any products or services;

2. never use any false designation of origin, false representation, or any false or misleading description of fact, that can, or is likely to, lead the consuming public or individual members thereof, to believe that any products or services produced, offered, promoted, marketed, advertised, provided, or sold by Defendants are in any manner associated or connected with EMI, or are licensed, approved, or authorized in any way by EMI;

3. never represent, suggest in any fashion to any third party, or perform any act that may give rise to the belief, that Defendants, or any of their goods or services, are related to, authorized by, or sponsored by EMI;

4. cease all use of the domain name *entrepreneurspirit.org* and any similar domain names, and never register any domain names that contain any of the EMI marks, or any domain names confusingly similar to any of the EMI marks;

5. cease all advertising of products or services under the ENTREPRENEUR SPIRIT mark, including but not limited to Defendants' magazine, Facebook page, Twitter account, and iTunes application;

6. never unfairly compete with EMI in any manner whatsoever, or engage in any unfair, fraudulent, or deceptive business practices that relate in any way to the production, distribution, marketing, and/or sale of products and services bearing any of the EMI marks; and

7. never apply for or seek to register the ENTREPRENEUR SPIRIT mark or any mark that is likely to cause confusion with any of the EMI marks.

The Court further **ORDERS** Defendants to file with the Court and serve upon EMI's counsel, within thirty (30) days after service of this order, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with this injunction.

The Court further **ORDERS** Defendants and their officers, directors, members, agents,

servants, employees, and attorneys, and all other persons acting in concert or participating with them, to transfer to EMI all domain names, including but not limited to *entrepreneurspirit.org*, in Defendants' possession, custody, or control that include the word "entrepreneur" or any misspelling thereof, or are otherwise confusingly similar to, or contain any of, the EMI Marks.

**VI. COSTS AND ATTORNEYS' FEES**

The Court hereby deems EMI to be the prevailing party in this action under 15 U.S.C. § 1117(a) and 54(d)(1) of the Federal Rules of Civil Procedure. Further, the Court deems this case to be exceptional under 15 U.S.C. § 1117(a) because of Defendants' intentional and willful misconduct, as well as their defiance and protraction of the judicial process by not responding or appearing in this matter. *Rio Props. v. Rio Int'l Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002).

Accordingly, EMI is hereby provisionally awarded its costs and reasonable attorneys' fees, and is directed to submit a request for costs and attorneys' fees in accordance with the procedures and deadlines set forth in Federal Rule of Civil Procedure 54(d) and Local Rule 54.

On this ______ day of _____________, 2015, **IT IS SO ORDERED**.

_______________________________

Susan Illston
United States District Judge


**CERTIFICATE OF SERVICE**

On August 14, 2015, I caused the attached **[PROPOSED] ORDER REGARDING PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT AGAINST KIRTON COMMUNICATIONS GROUP LIMITED AND MAS FINANCIAL & CORPORATE SERVICES LTD** to be emailed to the following:

Mr. Paul Pereira
Fitzwilliam, Stone, Furness-Smith & Morgan
48-50 Sackville Street
Port of Spain
Trinidad and Tobago
Email: ppereira@fitzwilliamstone.com

to arrange for personal service via messenger upon the following:

| Kirton Communications Group Limited<br>LP55 Moraldo Trace<br>Sam Boucaud Road<br>Santa Cruz<br>Trinidad and Tobago | MAS Financial & Corporate Services Ltd.<br>63 Aberdeen Park<br>Edinburgh Gardens<br>Chaguanas<br>Trinidad and Tobago |
|---|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 14, 2015, at San Diego, California.

/s/Patrick C. Justman
Patrick C. Justman